CLIFFORD ALVES JR. AND
TROY SIMOES

                                  *Plaintiffs,*

       **V.**

TOWN OF GLOUCESTER,
THE GLOUCESTER POLICE
DEPARTMENT, AND
POLICE CHIEF
LEONARD CAMPANELLO

                      *Defendants.*

**DOCKET NO. 1:18-CV-10654-MPK**

---

## FIRST AMENDED COMPLAINT

### PRELIMINARY STATEMENT

    This action is brought by the Plaintiffs, two Gloucester, MA policemen, who were, *inter alia*, harassed and discriminated against by the Defendants because of the Plaintiffs' service in the military, which irritated the Defendants because the Defendants believed the military service interfered in the Plaintiffs' performing their police duties in the manner the Defendants required.

### PARTIES

1.     At all times relevant hereto Plaintiff, Clifford Alves, was a resident of 13 Liberty Street, Gloucester, MA 01930.

2.     At all times relevant hereto Plaintiff, Troy Simoes, was a resident of 7 Ellery Street, Gloucester, MA 01930.

3.     Defendant City of Gloucester, MA was established in 1642.

4.     Defendant Gloucester Police Departmen ("Police Department") is located at 197 Main St. #1, Gloucester, MA 01930.

5.    Defendant Leonard Campanello, at the time of this cause of action was the City of
      Glouceste,r Chief of Police and resided in Saugas, Essex County, MA.

## JURISDICTIONAL BASIS

6.    The Court has jurisdiction to hear this matter pursuant to 38 USC §§ 4301 *et seq.*
      and 42 USC § 1983.

## FACTS (Alves)

7.    Alves served his country honorably as a member of the 82nd Airborne Division in
      the United States Army ("Army") since 1983 and has been a member of the
      United States Army Reserves since 1987.

8.    Alves began his employment for the City of Cloucester as a Police Officer in
      1998.

9.    Beginning in or around 1999 and continuing through the present, Alves
      experienced difficulty receiving time off from the Police Department to fulfill his
      contractual obligations and commitment to the Army.

10.   As a member of the Army Reserves, Alves is allotted seventeen (17) penalty-free
      days off work for mandatory Army drill dates that are scheduled far in advance.

11.   Throughout his almost 20-year career, the Police Department has continually and
      deliberately penalized Alves by docking him vacation days for these drill dates.

12.   This pattern and practice of discriminating against Alves for his military service
      includes an incident where Lieutenant ("Lt.") John Beaudette docked Alves a
      vacation day for attending a mandatory drill date.

13.   When challenged by Alves, Lt. Beaudette asked: "Why can't you work until 6:00
      AM, go to your drill, and then come back to work at 12:00 AM", completely

disregarding the biological fact that humans and soldiers require sleep at night to function during the day.

14. In 2006, Alves returned to work at the Police Department following the second of his three combat tours of duty in the Middle East, and the discrimination against him worsened.

15. At that time, Alves went to the Police Department's personnel director, Donna Leete ("Leete"), and requested that his vacation, personal, and sick days be calculated.

16. Per USERRA, vacation, personal, and sick days owed by their employers to service members which accrue during their military service can be used upon the soldier's return.

17. In response to Alves's request, Personnel Director Leete responded: "Why do you need vacation days? You've been on vacation for a year."

18. Alves responded that a United States soldier serving his or her country, during a time of war, is not on vacation.

19. While serving his country, Alves spent six (6) months in Kuwait in combat during Operation Enduring Freedom, eight (8) weeks in New Jersey training soldiers for combat, and then fourteen (14) months of active combat service in Iraq.

20. On February 3, 2014, Alves requested a personal day from the Police Department.

21. Alves was subsequently called in that day by Lt. David Quinn to rewrite a report.

22. Alves was not paid overtime for this task, and was forced to file a grievance to receive compensation for the overtime he worked.

23. Alves won the grievance he filed.

24.      Alves immediately suffered retaliation for filing the grievance.

25.      On Alves's next scheduled rotation, he was pulled from his assigned cruiser and ordered to do remedial report writing.

26.      Alves was also removed from the Police Department Training Division.

27.      The two above-described punishments against Alves were retaliation for Alves' requesting time off for military service and for filing a grievance when he was denied his rights.

28.      On August 23, 2015 Alves filed a grievance against management at the Police Department for a contractual violation.

29.      This violation occurred when Administrative, Lt. David Quinn, changed Alves' vacation blocks and number of vacation days per block.

30.      Alves had arranged for a fourteen (14) day vacation block in April of 2015, four months in advance.

31.      Although Alves was awarded a specific block of fourteen (14) days, Lt. Quinn changed it to thirteen (13) days, and docked Alves a personal day when he did not work on the fourteenth day.

32.      Unlike vacation days, an officer can take a personal day even if the amount of officers on staff that particular day would be below protocol; this makes them more valuable as they are more flexible.

33.      Though resolved by Deputy Chief McCarthy, who returned Alves' personal day and instead docked him a vacation day, demonstrating the continuing and ongoing harassment perpetuated by the Police Department against Alves because of his military service.

34. On August 30, 2015, Lt. Quinn retaliated against Alves for grieving the above-described incident by uncharacteristically questioning Alves' response time to a call and opening an investigation into Alves over the response time.

35. Immediately following Lt. Quinn's investigation, Lt. Quinn removed Alves from the training division.

36. The investigation found no wrong-doing on the part of Alves.

37. On October 1, 2015 Alves was disproportionately punished when he was placed on administrative leave and placed under house arrest for allegedly dumping leaves and grass at a compost yard.

38. Although routinely considered a minor offense (dumping leaves and grass violates a city ordinance with a punishment of a $20.00 fine), Alves was intentionally retaliated against and disproportionately disciplined in violation of USERRA: receiving a two (2) day suspension without pay, denied outside employment during the suspension, and a $300.00 fine.

39. When Alves requested that the union President, Leon Stuart, review this punishment a meeting occurred with Chief Campanello, who acknowledged that the disproportionate punishment did not fit the alleged offense, stating to Stuart that "I [Chief Campanello] know this [the punishment for littering] is severe."

40. In situations that require an officer to take administrative leave, that officer is normally allowed to finish his shift before leave begins.

41. In Alves' dumping case, Alves was sent home in the middle of the day, so as to purposely embarrass and humiliate him.

42. Other officers, who were not U.S. veterans and/or reservists, were also dumping leaves in the same location, and the only discipline they received was a written warning from the Department of Public Works.

43. Deputy Chief McCarthy intentionally retaliated against Alves by giving him a punishment separate from that administered by the Department of Public Works.

44. No other officer received a similar punishment.

45. While on administrative leave for this minor offense, Alves was again harassed and discriminated against in violation of USERRA when Deputy Chief McCarthy ordered Alves not to contact anyone at Department of Public Works regarding the incident.

46. Had Alves been allowed to contact Department of Public Works, he would have been able to obtain evidence that he had permission to dump leaves and grass at the aforementioned compost yard.

47. On information and belief, numerous other officers of the Police Department have violated city ordinances or criminal laws, including, inter alia, drinking in public, domestic violence, a hit and run with property damage, smoking, and 94C drug violations, but have not received suspensions or any discipline at all.

48. On January, 11 2016, Boylston Police Academy Director John Mulloy sent Chief Campanello a thank you letter for Alves's participation in the teaching of applied patrol procedures for the recruits in his academy (*See* [Mulloy Letter] attached as Ex. "A").

49. Instead of being praised for the letter, Alves was reprimanded.

50. Alves was called into the watch commander's office by Deputy Chief McCarthy with Sgt. Nicastro also present.

51. The two officers proceeded to interrogate Alves, asking him who authorized him to teach at the Boylston Academy, whether or not he taught there on his own time, and whether he requested Director Mulloy to write the letter.

52. Alves had been authorized to teach at the Academy and he did not request any special treatment from Director Mulloy.

53. On April 13, 2016, Alves was involved in a training accident at Fort Devens Firearms Range while working for the Massachusetts Police Training Council as firearms instructor for the Randolph recruits (See [Chief Letter 1] attached as Ex. "B").

54. That day, Alves was instructed that there would be an independent investigation into the April 13 accident and was ordered in to work by Deputy Chief McCarthy and instructed to sign paperwork which placed him on administrative leave from April 13, 2016 until the investigation concluded.

55. The investigation took over 102 days.

56. Signing the administrative papers required Alves to go to the station outside of his scheduled work hours of 4:00 pm – 12:00 am.

57. Alves' being ordered on administrative leave, for a training accident, was yet another example of intentional discrimination and harassment in violation of USERRA based on Alves's original grievance and the events that transpired since his original grievance.

58. On May 12, 2016, Alves and three other officers attended a police union meeting wearing t-shirts that read "Free Cliffy" across the front. (*See* [Free Cliffy T-Shirt Pictures], attached as Ex. "C".).

59. On information and belief, by May 12, 2016, Chief Campanello had already received the report from the investigation into the accident.

60. The report determined that Alves was not at fault and the accident was classified as a training accident. (*See* [Report], attached as Ex. "D".).

61. Despite Chief Campanello knowing the April 13, 2016 incident was an accident, he kept Alves on administrative leave and retaliated against the three officers who wore the "Free Cliffy" t-shirts to the union meeting by removing them from their positions as firearm instructors at the training division.

62. On May 13, 2016, Chief Campanello again retaliated against Alves by suspending his license to carry a firearm ("LTC") and adding an arbitrary and unnecessary "No Outside Employment" clause to Alves's administrative leave, reversing his prior approval granting Alves outside employment. (*See* [Chief Letter 2], attached as Ex. "E").

63. Chief Campanello had never revoked or suspended an officer's LTC prior to May 13, 2016: this includes an October 15, 2015 incident, when an officer on administrative leave for a substance abuse problem was able to retain his license to carry; a February 2016 incident when a civilian took out an M.G.L. Chapter 209A restraining order against an official; and a July 2016 incident when an officer admitted having a drug abuse problem and turned in his department issued equipment.

64. On information and belief, In all three of the above-described incidents, the officers in question retained their LTC.

65. Chief Campanello continued to violate USERRA and harass Alves by refusing to provide him or his union attorney a copy of the report which supposedly explained the reason Alves' LTC was suspended.

66. To appeal the decision, Alves was required to enter the Gloucester District Court, which is located in the same building as the Police Department.

67. Alves was warned that he would be arrested for trespassing if he entered the Police Department's building without being escorted by Deputy Chief McCarthy, making it impossible for him to enter the Gloucester District Court to file an appeal regarding his LTC suspension without special permission from Chief Campanello.

68. On May 20, 2016 Alves was ordered to conduct a fitness-for-duty evaluation in Beverly, MA outside his scheduled work hours of 4:00 pm to 12:00 am.

69. On June 29, 2016 Alves followed written orders to comply with an administrative investigation by meeting with a private investigator in Boston outside his scheduled work hours of 4:00 pm to 12:00 am.

70. On July 20, 2016 Alves followed written orders to comply with an administrative investigation by meeting with a private investigator in Boston outside his scheduled work hours of 4:00 pm to 12:00 am.

71. On August 4, 2016 Alves wrote a letter to Deputy Chief McCarthy requesting over-time pay for the four aforementioned dates (April 14, 2016; May 20, 2016;

June, 29 2016; and July 20, 2016), which he never received (*See* [Alves Letter 1], attached as Ex. "F").

72.    While Alves was on administrative leave, Chief Campanello agreed to allow Alves to go on a trip that was booked and paid for months earlier.

73.    As Alves was already on administrative leave and not allowed to work, he should have been able to go on the trip without using up vacation days.

74.    However, on August 3, 2016, Alves discovered that four of his vacation days were being deducted by the Police Department because of his trip.(*See* [Department Comp Sheet] attached as Ex. "G")

75.    Alves wrote a letter to Deputy Chief McCarthy requesting the reason why vacation days were being retroactively taken from him, because he could not have worked those while on administrative leave (*See* [Alves Letter 2], attached as Ex. "H").

76.    In retaliation, he received a snide reply from Chief Campanello on August 10, 2016 (*See* [Chief Letter 3], attached as Ex. "I"), directing him to seek remedy with the Mayor's office.

77.    On September 15, 2016, Alves discovered that the Gloucester Police official Facebook page stated that he (Alves) had created a fake Facebook profile to post derogatory information about the Police Department and its senior officers (*See* [Facebook Posts], attached as Ex. "J")

78.    Alves vigorously denied and continues to deny this accusation.

79.    On December 24, 2016, Lt. Quinn verbally harassed Alves and his trainee over an incomplete police report; despite Alves' explanation that his trainee, Officer

D'Angelo, was only on the scene originally to gain experience on drug cases but had been handed the report inappropriately by the original officer on the scene.

80. Lt. Quinn terminated Alves from his position as a training officer, despite Alves being one of only four officers in the Police Department to go through the forty (40) hour Field Officers Training Course and who has the most experience in the Police Department as a trainer in multiple police disciplines.

81. Lt. Quinn's actions were unreasonable and discriminatory towards Alves by removing him from the Field Training list without cause.

82. During Chief Campanello's tenure as Chief of the Police Department, Alves was the only officer to be put on administrative leave for a minor non-work related city ordinance violation; the only officer to have his LTC suspended; the only officer to be deprived of his due process rights; the only officer to have his outside employment impeded by the Police Department; and the only officer to be pulled out of the Training Division without cause.

## FACTS (Simoes)

83. Simoes served honorably in the United States Coast Guard ("Coast Guard") from 2002-2006, and served in the Coast Guard Reserves from 2006-2014.

84. In May 2012 Simoes graduated the police academy and began full-time employment as a police officer for the Police Department.

85. In the summer of 2012 Simoes requested time off from work to fulfill his Coast Guard commitment.

86. The Coast Guard provides its Reserve Guardsman with drill dates in advance.

87. Chief Campanello reluctantly granted Simoes his requested time off from work; however, as a result, Simoes began experiencing constant and continuous harassment in violation of USERRA.

88. In the summer of 2013, the harassment worsened after Simoes turned in his drill schedule (which included contact information for his Coast Guard supervisor) for the year of 2013, and Chief Campanello began instructing his Deputy and shift supervisors to also harass Simoes.

89. Throughout his employment and to the present time, Deputy Chief McCarthy has continually demeaned Simoes' service by making statement such as; "When are you going to leave the reserves? You can make more money working overtime here [at the Police Department]."

90. Deputy Chief McCarthy often stated: "You know you're costing the city [Gloucester] a lot of money."

91. Simoes was shocked and dismayed by the treatment he received.

92. On information and belief, the Chief instructed the Deputy Chief to inform Simoes that the Department was extremely unhappy with his service, which made Simoes very uncomfortable and made his weekend drill periods something he was apprehensive about rather than excited about, causing him great stress.

93. Although the Police Department was provided Simoes' drill schedule in advance for every date that he needed to fulfill his service commitments to the Coast Guard, the Chief and the Police Department still harassed him by asking him to present the Police Department with separate military orders for each drill date, knowing that the Coast Guard does not provide separate orders for each drill date.

94. Simoes provided signed letters from his superiors in the Coast Guard, however, the harassment did not cease.

95. When Simoes asked an officer at the Police Department, named Lt. Aiello, why he was being treated this way, the Lt. replied; "Chief [Campanello] is on my ass about this, Troy, it's not coming from me, and he [Chief Campanello] won't let it go."

96. Simoes contends that the Department, at the Chief's direction, was purposely harassing him so he would resign from military service.

97. While at a Coast Guard drill date, Simoes was called by the Police Department and told he was supposed to be at work, and was not marked on the schedule for military duty, so a fellow patrolman was held over.

98. To avoid this from happening prior to his monthly drill period, Simoes made a habit of confirming with his supervisors that he was taken off the schedule at the Department and put down for military service prior to each drill date.

99. Each time he did so, it was reiterated that he was costing the city money and the Chief was not happy about it.

100. This caused Simoes great anxiety prior to and following his military drill periods each month.

101. Simoes confided in Lt. Aiello: "I [Simoes] don't know what to do, Lieutenant. I've tried everything to make him [Chief] happy. The Coast Guard doesn't know what else to do either it's the first time they've had to deal with an employer acting like this."

102. This harassment rose to the point of physical assault in the summer of 2014 when Simoes was physically assaulted by the Chief [Campanello] when he shoulder-checked him into a copy machine at work.

103. As a result, Simoes was afraid to be in the area of the Chief's Office.

104. Despite his fear, Simoes had to obtain the Chief's signature to take the Sergeant's exam and did so.

105. Chief Campanello did not speak to Simoes and only gave him a dirty look when signing the paperwork.

106. Simoes took the Sergeant's exam because it was common knowledge at the Police Department that if Chief Campanello promoted a Lieutenant into a newly created Deputy Chief's position, he would backfill the vacant Lieutenant's position with a Sergeant creating a new Sergeant position.

107. Simoes was qualified for, and believed he was entitled to, a promotion, since he received the second highest score on the exam, and the officer who received the highest score had left the Police Department before the promotion was given.

108. After Simoes received his test results, the Police Department failed to promote him.

109. This promotion would have provided less expensive health and dental care, as well as educational benefits and extra income for Simoes and his family.

110. Simoes was routinely not timely compensated for police work he performed because of his military service.

111. Not being timely paid for work completed was very abnormal, because in the normal course of business officers in the Police Department are paid within a month of performing their duties.

112. Simoes contends he was not being paid because Chief Campanello had instructed his [Chief Campanello's] secretary not to submit his hours.

113. Simoes confronted Chief Campanello's secretary about this, and a week later she physically assaulted him by shoulder-checking him into a copier, just as Chief Campanello had done previously.

114. This harassment and discrimination by the Police Department resulting in Simoes not renewing his contract with the Coast Guard, which resulted in a military discharge and a loss of income.

115. In January 2015, Simoes became a union representative for the Department.

116. Shortly thereafter, Deputy Chief McCarthy offered Simoes a secondary boat operator position based on his Coast Guard skills and training.

117. Simoes accepted the Deputy Chief's offer.

118. In February 2015, in his capacity as a union representative, Simoes asked Deputy Chief McCarthy to put on a road detail of officers for public safety regarding a situation that he thought required one (*See* [Gloucester Police Printout], attached as Ex. "K").

119. Deputy Chief McCarthy refused, saying the Police Department will only assign a road detail if the public safety issue is extreme, which is contrary to actual Police Department protocol.

120. After this incident, and the next time Simoes saw Deputy Chief McCarthy, he asked about the boat operator position.

121. In response, Deputy Chief McCarthy told Simoes not to bother applying for the boat operator position anymore.

122. When Simoes asked why, the Deputy Chief responded that he (Simoes) needed to change his attitude because he (Deputy Chief) was "number one on the Sergeants' list now," implying that he (Deputy Chief) would be reprimanded if he promoted Simoes to the boat operator position.

123. On October 19, 2015 Simoes began documenting the Chief's abuse of power, corruption, USERRA violations, harassment, intimidation, misappropriation of funds, the Chief's Office was operating under. These accusations are outlined in the Harassment Complaint submitted to the City of Gloucester. (*See* [Harassment Complaint] attached as Ex. "L")

124. Simoes, who was the Secretary of the Gloucester Police Patrolman's Association (GPPA) at this time, grieved two incidents of the Chief's abuse of power and corruption.

125. The first grievance (*See* [Grievance 1] attached as Ex. M") included complaints made by his fellow patrolman, including a request for pay on behalf of one patrolman.

126. The second grievance stated that a prisoner with violent tendencies who was found to be too dangerous to be released on bail received special treatment by the Chief because the Chief and the prisoner knew each other (*See* [Grievance 2] attached as Ex. "N").

127. After the grievances were filed, the Chief ordered Simoes to meet with him.

128. The Chief threatened to take away the Police Department's television and laptops which all officers enjoyed using, and ordered Simoes to re-write the grievance and remove certain aspects of it.

129. On November 2, 2015 Simoes wrote two new grievances regarding the incident.

130. Chief Campanello stated that in order to resolve the grievance and not take the TV and laptop away from Simoes' fellow officers, Simoes would have to come to work on his time off to shred the previous copy of the grievance that he had submitted.

131. Chief Campanello ordered Simoes to the shredder machine interrogating him, raising his voice, and pointing at him.

132. Simoes was fearful that he would be physically assaulted again.

133. The first re-write (See [Re-write 1] attached as Ex. "O") did not remove enough information regarding the incident, according to the Chief, and Simoes was ordered to write a second letter.

134. Simoes was ordered to remove accusations that he believed to be true; specifically, those accusing the Chief of granting special privileges and special treatment to certain officers and civilians, disregarding the safety of patrolman, and damaging the Department's morale.

135. After Simoes was forced to make these changes, Chief Campanello accepted the letter. (*See* [Re-write 2] attached as Ex. "P")

136. On November 5, 2015 Chief Campanello responded in a demeaning, insulting letter that criticized the grievance Simoes submitted and contained falsities

17

regarding the conversation Simoes had with him. (*See* [Chief Letter 4] attached as Ex. "Q"))

137. On May 10, 2016 Simoes was one of the officers wearing "Free Cliffy" t-shirts to show support for Alves when he was unfairly put on administrative leave after his training accident. (*See* Ex. "C")

138. On May 12, 2016 Simoes was terminated from his job at the Gloucester Firearms Training Facility in retaliation for his military service and for exercising his right to free speech.

139. On May 19, 2016 Simoes filed yet another grievance as a result of his being wrongfully removed from his employment as a firearms training instructor. (*See* [Grievance 3], attached as Ex. "R")

140. Although Chief Campanello claimed Simoes' termination was a financial decision, Simoes received a text from the watch commander, in charge of training, which contradicts the Cheif. (*See* [Text], attached as Ex. "S")

141. In June 2016, Simoes missed an overtime shift because he was severely ill.

142. Though officers in the Police Department do not normally require permission to miss an overtime shift, Simoes was severely harassed as a result of his missing the overtime shift.

143. In response to this missed shift, the Police Department opened up two frivolous investigations into Simoes, while he was preparing for a second Sergeant's exam.

144. One of the investigations was for the aforementioned overtime shift cancelation, and one was for the aforementioned "Free Cliffy" t-shirt.

145.  On information and belief, the Police Department has not opened an investigation because of a canceled overtime shift in thirty (30) years.

146.  Simoes contends the Chief and the Police Department opened these investigations solely to harass him because of his military service and to distract him while he was trying to prepare for Sergeants' exam.

147.  Also in 2016 while Simoes was studying for a second sergeant's exam, the Police Department continued their pattern of harassment by accusing him of creating the aforementioned Facebook posts that neither he nor Alves had anything to do with (*See* Ex. "J")

148.  On September 15, 2016, Simoes discovered that the Police Department's official Facebook page stated that Simoes had created a fake Facebook profile to post derogatory information about the Police Department and its senior officers.

149.  This accusation is patently false.

150.  In a second attempt to prevent Simoes from passing the sergeants exam, the Police Department initiated an investigation into his allegedly having a role in the "Pond Road Sex Scandal"

151.  There is no evidence that Simoes had a role in the Pond Road Sex Scandal.

152.  However, the Police Department opened an investigation into Simoes over the scandal, and went so far as to intimidate and frighten Simoes' wife by serving him with notice of this investigation at his home (*See* [Pond Road Letter], attached as Ex. "T"), instead of while he had was at work at the Police Department the previous night.

153. In August 2016, Simoes filed a harassment complaint with the City of Gloucester Personnel Office for all the aforementioned incidents. (*See* Ex. "L")

154. Shortly after this harassment complaint was filed, Donna Leete, the Personnel Director of the Police Department, attempted to bribe and/or extort Simoes by informing him that Chief Campanello stated he could have a promotion if he withdrew the Complaint.

155. In a November 2016 meeting with Simoes and Deputy Chief McCarthy, Leete admitted that Chief Campanello attempted to extort Simoes by ordering her to call Simoes and tell him there was a promotion available if he withdrew the harassment complaint.

156. Chief Campanello's and other officers at the Police Department's actions were meant to intentionally punish Simoes and caused him an extreme amount of stress and lack of sleep under a constant state of worry.

## STATEMENT OF CLAIMS

### COUNT I:

157. Plaintiffs re-affirm and re-allege the foregoing paragraphs 1-156 above as if set forth again here.

158. Defendants have violated Plaintiff Alves' rights under USERRA.

### COUNT II:

159. Plaintiffs re-affirm and re-allege the foregoing paragraphs 1-158 above as if set forth again here.

160. Defendants have violated Plaintiff Simoes' rights under USERRA.

### COUNT III:

161. Plaintiffs re-affirm and re-allege the foregoing paragraphs 1-160 above as if set forth again here.

162. The Defendants violated Plaintiff Alves' constitutional and civil rights under 42 USC §1983.

<h3 style="text-align:center;"><u>COUNT IV</u>:</h3>

163. Plaintiffs re-affirm and re-allege the foregoing paragraphs 1-162 above as if set forth again here.

164. The Defendants violated Plaintiff Simoes' constitutional and civil rights under 42 USC §1983.

### REQUESTS FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully requests the following from this Court:

A. Enter a judgment for Plaintiffs on all counts of this Complaint;

B. Award Plaintiffs damages as determined at trial, plus interest and costs as provided by law;

C. Award Plaintiffs multiple damages and attorney's fees.

D. Award Plaintiffs damages for pain and suffering.

E. Award Plaintiffs such other and further relief as the Court deems just, proper, and equitable.

### JURY TRIAL DEMANDED

Plaintiffs demand a jury on all issues so triable.

Dated: June 18, 2018

RESPECTFULLY SUBMITTED,

Plaintiffs, Clifford Alves and
Troy Simoes

By their attorneys,

/s/ Adam B. Sloane
Adam B. Sloane (BBO#695302)
Chambers Law Office
220 Broadway, Suite 404
Lynnfield, MA 01940
Tel: (781) 581-2031

-and-

/s/ Richard Chambers, Jr.
Richard C. Chambers, Jr. (BBO#651251)
Chambers Law Office
220 Broadway, Suite 404
Lynnfield, MA 01940
Tel: (781) 581-2031