# EXHIBIT 1

1

VOLUME: I
PAGES: 1-273
EXHIBITS: 1-5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Docket No. 1:18-cv-10654MPK

CLIFFORD ALVES, JR., AND          )
TROY SIMOES,                      )
      Plaintiffs,               )
                           )
   VS.                            )
                           )
CITY OF GLOUCESTER, THE           )
GLOUCESTER POLICE DEPARTMENT,     )
AND POLICE CHIEF LEONARD          )
CAMPANELLO,                       )
      Defendants.               )

DEPOSITION OF CLIFFORD A. ALVES, JR.,
a witness called on behalf of the Defendants,
taken pursuant to the applicable provisions of
the Federal Rules of Civil Procedure, before
Susan L. Prokopik, Registered Merit Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Rossman &
Rossman, 8 Essex Center Drive, Peabody,
Massachusetts on Tuesday, December 10, 2019,
commencing at 10:07 a.m.

11

1          MR. ROSSMAN:  You haven't moved in the

2     last five seconds?

3  A.  Since 1996 I believe.

4  Q.  Any plans to move?

5  A.  No.

6  Q.  All right.  If you could please give us your

7     educational background.

8  A.  Master's degree in science.  Western New England

9     College.

10 Q.  And do you have a Bachelor's degree?

11 A.  I do.

12 Q.  When did you obtain that?

13 A.  2004.

14 Q.  And where did you obtain that from?

15 A.  Western New England College.

16 Q.  Where did you take classes for that?

17 A.  All over the Commonwealth.

18 Q.  What was your major?

19 A.  Criminal justice.

20 Q.  Same with your Bachelor -- sorry.  Same with your

21     Master's degree?

22 A.  Yes.

23 Q.  Please tell us your employment history.

24 A.  Prior to GPD?

12

1   Q.   Yes, please.

2   A.   I was in the military from -- active duty from

3        '83 to '87.

4   Q.   And during that time, what was your role and your

5        duties and where were you?  Where were you

6        located?

7   A.   Fort Bragg, North Carolina.  Airborne

8        infantryman.

9   Q.   Were you at Fort Bragg from '83 to '87?

10  A.   Yes.

11  Q.   Were you stationed anywhere else?

12  A.   No.

13  Q.   After 1987, what did you do for work?

14  A.   Various construction jobs.

15  Q.   Where were those?

16  A.   In Gloucester.

17  Q.   And for approximately how long did you work

18       construction jobs in Gloucester?

19  A.   To about 1990.

20  Q.   What did you do in 1990?

21  A.   I worked as a contractor for a guy out of

22       Danvers.

23  Q.   How long did you do that?

24  A.   Up until I got hired for the City of Gloucester.

14

1  A.  I was hired full-time in October of '98 but Civil

2      Service is a different date.

3  Q.  What's your Civil Service date?

4  A.  October the following year.

5  Q.  Why is there a difference?

6  A.  They had me hired as a full-time reserve and then

7      full-time officer.

8  Q.  Okay.  So for approximately a year you worked as

9      a full-time reserve officer?

10 A.  Yes.

11 Q.  And then you started as a full-time officer in

12     October of 1999?

13 A.  I started as a full-time officer in '98 after

14     completion of the academy but on paper it says

15     reserve officer.

16 Q.  When did you graduate from the full-time academy?

17 A.  March of '99.

18 Q.  Which academy did you go to?

19 A.  Reading.

20 Q.  Have you received any promotions within the

21     Gloucester Police Department?

22 A.  None.

23 Q.  Have you taken any exams to apply for promotions?

24 A.  I have.

19

```
1       agree to the usual --

2                MR. DONOHUE:  We did at the very

3       beginning.

4                MR. CHAMBERS:  Reserve except to the

5       form of the question?

6                MR. DONOHUE:  Right.  Motions to strike

7       reserved.  The witness has 30 days to read and

8       sign.  Waive the notary.

9                MR. CHAMBERS:  Good.  Yeah.

10               MR. DONOHUE:  We also agreed for any

11      future depositions we could just refer to the

12      usual stipulations here and then we'll move on.

13               MR. CHAMBERS:  All right.  Sounds good.

14               MR. DONOHUE:  You need a moment to get

15      settled or anything?

16               MR. CHAMBERS:  No.  Go ahead.

17  Q.  Officer, when we had just left off a moment ago I

18      believe you said you were removed from being a

19      field training officer due to an incident that

20      occurred on April 13, 2016; is that right?

21  A.  Yes.

22  Q.  And since that time, have you served as a field

23      training officer?

24  A.  No.
```

20

1    Q.   When you say "the incident of April 13, 2016,"
2         are you referring to an accidental shooting?
3    A.   I'm referring to an accidental discharge of a
4         firearm.
5    Q.   And since that time you have not served as a
6         field training officer?
7    A.   Correct.
8    Q.   Have you testified about all the times that you
9         were a field training officer, removed from being
10        an officer and then being put back in that field
11        training role?
12   A.   Could you refer that question?
13   Q.   Right.  I'm asking you questions now about some
14        special assignments that you've had --
15   A.   Correct.
16   Q.   -- since you've served as a police officer.
17                  You had testified that you were a field
18        training officer at some points during your
19        career; is that right?
20   A.   Yes.
21   Q.   Have you testified about all the times that you
22        were a field training officer and then removed
23        from being a field training officer?
24   A.   Those are the only -- what I explained to you are

21

1   the only ones I recall at this time.

2   Q.  Do you think there may have been other times that

3       you had served as a field training officer but

4       were removed?

5   A.  I would have to look back at documents in my

6       personnel folder at City Hall.

7   Q.  You had also said that you were a firearms

8       instructor?

9   A.  I was.

10  Q.  Are you currently a firearms instructor?

11  A.  No.

12  Q.  And when were you most recently removed from

13      being a firearms instructor?

14  A.  April 13, 2016.

15  Q.  And that's due to the accidental discharge?

16  A.  Yes.

17  Q.  When did you first become a firearms instructor?

18  A.  2004.

19  Q.  When was the first time you were removed from

20      being a firearms instructor?

21  A.  Same dates and times from the same person as the

22      previous FTO questions.

23  Q.  So those other times that you testified the

24      Lieutenant Quinn would remove you from being a

31

1   Q.   Who is the current chief?

2   A.   Edward Conley.

3   Q.   When did he become chief?

4   A.   This year.

5   Q.   At some point in 2019?

6   A.   Yes.

7   Q.   Do you know the month?

8   A.   I do not.

9   Q.   Who was the chief prior to Chief Conley?

10  A.   We had an interim chief.

11  Q.   Who was the interim chief?

12  A.   John McCarthy.

13  Q.   Do you consider Chief McCarthy to have been fair?

14  A.   No.

15  Q.   And what's your basis for the testimony that

16       Chief McCarthy was unfair?

17  A.   He held patrol to a higher standard than

18       supervision.  And in saying that, during a

19       meeting he went on to tell us there's no reason a

20       patrolman should be making more than a retired

21       lieutenant on a detail.

22  Q.   Is there any other way that you found Interim

23       Chief McCarthy to be unfair?

24  A.   Supervisors weren't held accountable where patrol

```
 1        was.
 2   Q.   So Chief McCarthy -- was his first name John?
 3   A.   Yes.
 4   Q.   He has since retired?
 5   A.   Yes.
 6   Q.   Chief McCarthy was harder on patrol than on
 7        supervisors?
 8   A.   Correct.
 9   Q.   Do you have an understanding as to why he did
10        that?
11   A.   He condoned certain behavior from his
12        supervisors.  The same behavior wouldn't be
13        tolerated by patrol.  You'd have to ask him.
14   Q.   Any other ways that you felt Chief McCarthy was
15        unfair to you?
16   A.   To me personally?
17   Q.   Right.
18   A.   I believe that he had a lot to do with it because
19        -- that's just how I felt.  It seemed personal
20        when he came after me.
21   Q.   Why do you allege that Chief McCarthy came after
22        you?
23   A.   Because after one of the meetings at City Hall
24        Chief Campanello said he had no knowledge of what
```

34

1    overheard between Chief Campanello and Director
2    Lette.
3 A. I only heard the part where he said he had no
4    knowledge of what was going on but he was backing
5    up his deputy.
6 Q. What was the issue?
7 A. It was over discipline.
8 Q. Discipline towards?
9 A. Towards me.
10 Q. What was the issue?  What were you disciplined
11    for?
12 A. I was disciplined for allegedly illegally
13    dumping.  Conduct unbecoming.
14 Q. And it's your understanding that it was
15    McCarthy's decision to discipline you for the
16    illegal dumping?
17 A. Yes.
18 Q. At that time was he deputy chief?
19 A. He was.
20 Q. Why do you allege that Deputy Chief McCarthy
21    disciplined you for your dumping?
22 A. He felt it was a breach of policy and procedure.
23 Q. At that point did you feel like he was out to get
24    you?

35

1    A.   I did.

2    Q.   What's your understanding of why he was out to

3         get you at that time?

4    A.   I don't understand why.

5    Q.   You just feel like it was a personal thing?

6    A.   I do.

7    Q.   If you look at the last paragraph of Exhibit 1,

8         please.

9              If you could please read that to

10        yourself and let us know when you're finished.

11   A.   Okay.

12   Q.   Have you had a chance to read the last paragraph

13        of Exhibit 1?

14   A.   I have.

15   Q.   And Exhibit 1 is dated September 1st of 2016?

16   A.   Correct.

17   Q.   And this is a complaint that you had sent to the

18        personnel director, Donna Lette?

19   A.   Yes.

20   Q.   And I believe you said that the reason you made

21        this complaint was because you felt like

22        supervisors and patrol officers were being

23        treated differently?

24   A.   They were.

49

1  A.  I trained the Iraqi Army on Russian equipment

2      with British tactics.

3  Q.  Say that again.

4  A.  I trained the Iraqi Army on Soviet equipment

5      using British tactics.

6  Q.  Is that what you did for your entire deployment

7      and service in Iraq during that time?

8  A.  Yes.  I was an advisor.

9  Q.  Were you deployed again after that?

10  A.  I had retired after that.

11  Q.  When did you retire from the military?

12  A.  The exact date I don't recall but it was in 2006

13      or seven.  I would have to look at my paperwork.

14  Q.  Have you served in the military in any capacity

15      since '06 or '07?

16  A.  No.

17  Q.  Why did you retire from the military at that

18      time?

19  A.  Because I was getting a lot of flack from the

20      department being deployed so many times in a

21      short period of time where guys couldn't get days

22      off from work.

23  Q.  What do you mean by you were "getting flack"?

24  A.  Just other employees were getting pissed because

62

```
 1        paperwork for that time period and research exact
 2        numbers.  I felt that by the City making me go
 3        through the whole grievance process again to get
 4        basic rights that I should have got automatically
 5        which was set forth under their policy and that
 6        they had already had an agreement with and
 7        they've already given it to other officers, why
 8        not give it to this officer?
 9                  Why is this officer here A being
10        treated different than officer B?
11   Q.   What other officers are you talking about?
12   A.   Officer Chris Frates and Officer Steven DeCrosta.
13   Q.   Did Chris Frates serve in the military?
14   A.   Both of them were in the United States Coast
15        Guard.
16   Q.   Do you consider that part of the military?
17   A.   They are.  They fall under the Department of Navy
18        under combat.
19   Q.   But you're kind of smirking.
20   A.   Because I call them puddle pirates.
21   Q.   So did Chris Frates, did he receive all the
22        benefits to your understanding to which he was
23        entitled as being a member of the US Coast Guard?
24   A.   Not only did he receive more benefits than I got
```

63

1    when he got deployed, he also got paid by the

2    City while he was deployed.

3  Q.  Were you paid by the City when you were deployed?

4  A.  I was not.

5  Q.  And why was he paid serving the military and you

6    weren't paid when you were serving the military?

7  A.  What I was told, it was a difference in rank.

8    That his City pay was less than his -- his City

9    pay was more than his military pay so they paid

10   the difference.

11 Q.  Is your military pay more than your City pay?

12 A.  Base pay to base pay, no.

13 Q.  But when you get deployed, you get extra combat

14   pay?

15 A.  You do.

16 Q.  And so when you were deployed overseas, were you

17   making more through the military than you would

18   have been paid as a patrol officer?

19 A.  I would say no because being deployed I don't

20   have the opportunity to work details and

21   overtime, which I would have made if I wasn't

22   deployed.  And if they averaged it out, it would

23   have been a lot more money made on the civilian

24   side.

64

1  Q.  When you're deployed, what is it that you think
2      the City should have been responsible paying you
3      for?
4  A.  The difference between base pay and base pay like
5      they did with everybody else.  They didn't factor
6      in his cost of living, his housing or anything
7      like that.  They did base pay to base pay, but
8      with me they factored in hostile fire pay,
9      housing and every other benefit that I got with
10     my base pay.
11 Q.  As part of the military?
12 A.  As part of my military.  With him, it was base
13     pay to base pay.
14 Q.  And approximately what were you paid for your
15     most recent deployment when you were in the
16     military?
17 A.  I'd have to look at my tax returns for that.
18 Q.  Steven DeCrosta, he was in the US Coast Guard?
19 A.  Yes.
20 Q.  And he was deployed?
21 A.  He was.
22 Q.  Do you know where he was deployed to?
23 A.  I do not.
24 Q.  And what benefits did he receive when he was

65

1    deployed?

2  A.  He got paid in full and then it was determined

3      that he lied about his rank and then he had to

4      pay the City back.

5  Q.  And why is it that you allege that Frates and

6      DeCrosta were treated differently than you when

7      they were deployed through the military than when

8      you were deployed through the military?

9  A.  Emotions.

10  Q.  Emotions by who?

11  A.  The City.

12  Q.  Can you explain that to us, please?

13  A.  Yes.  So you go to a shooting like a Sandy Hook

14      shooting.  All the politicians are up in an

15      uproar and they want to pass every gun law

16      possible and they're voting with their heart

17      instead of with common sense.

18              So in this instance, these guys got

19      deployed on September 12th after the September

20      11th bombings so the City was acting out of their

21      heart, not out of their head so yes, it was very

22      emotional.  We're a nation in crisis at the time.

23  Q.  Any other reasons that you allege you were

24      treated differently than these other officers who

67

1        were given to them.

2    Q.   I'm asking you, why is that?

3    A.   I have no knowledge on why.  I can't tell you why

4        you would treat one person better than another.

5        It happens.

6    Q.   Right.  That's what I want to find out because I

7        don't work there.  They served in the military.

8        You served in the military.  Why are Frates and

9        DeCrosta being treated differently for their

10       military service than you were for your military

11       service?

12   A.   I don't know why.

13   Q.   Do you allege that there's a reason that some

14       City or department officials don't like you?

15   A.   Because for almost two-thirds of my police career

16       I've been a union representative.  As a union

17       rep, you cross -- you stick up for your guys so

18       you piss certain people off.

19   Q.   Do you allege that any other union officials were

20       treated unfairly?

21   A.   I would say yes but, you know, I'm going back

22       years.  Everybody got treated different as a

23       union rep.

24   Q.   Who else do you allege was treated differently

91

1          (Recess.)

2  Q.  In April of 2016, you were involved in an

3      accidental discharge?

4  A.  I was.

5  Q.  Do you remember the exact date?

6  A.  I believe it was April 13, 2016.

7  Q.  What happened?

8  A.  I was passing a firearm to another instructor.

9      My whistle lanyard got caught and the firearm

10     went off.

11 Q.  Who was the other instructor?

12 A.  Jamie Griffin.

13 Q.  And he was also an instructor?

14 A.  Yes.

15 Q.  And where was he from?

16 A.  He's retired from Mendon or something like that.

17 Q.  And where did this accidental discharge take

18     place?

19 A.  On Alpha Range, Fort Devens.

20 Q.  What was your role there?

21 A.  I was the academy lead instructor.

22 Q.  What were your duties as the lead instructor?

23 A.  To instruct the recruits.

24 Q.  Who were the recruits?

92

1   A.   The Reading class for that year.

2   Q.   Was this part of the Reading Police Academy?

3   A.   The Randolph.  Sorry.  Randolph.

4   Q.   And had you served as an instructor on firing

5        ranges previous to this?

6   A.   Yes.

7   Q.   Approximately how many times?

8   A.   It's hard to say an exact number.

9   Q.   Is there a period of years you can tell us where

10       you've served as a firearms instructor?

11  A.   I served in the military as a firearms instructor

12       for a period of 1988 to 2006 and in the police

13       world from 2004 to 2016.

14  Q.   In the military, did you ever have any accidental

15       discharges?

16  A.   None.

17  Q.   So when you were passing this firearm to Jamie

18       Griffin, were you aware that it was loaded?

19  A.   I was.

20  Q.   And then you said something happened while you

21       were passing this firearm.  What happened?

22  A.   My whistle lanyard got caught between the trigger

23       and the trigger guard.  And as I rotated the

24       weapon to hand it to Jamie to take a positive

93

1       grip on it, it had gone off.

2   Q.  What's a whistle lanyard?

3   A.  It's a rope on the back of a whistle with a piece

4       of plastic on it.

5   Q.  Is it an actual whistle?

6   A.  Yes.

7   Q.  And what's the purpose of the whistle?

8   A.  Sometimes when you yell "ceasefire," it can't be

9       heard by everybody on the range because it's

10      spread out over a great distance but three

11      consecutive blows of a whistle, everybody knows

12      to stop.

13  Q.  Other than a plastic whistle with some kind of --

14      strike that.

15              Is this essentially some kind of

16      plastic whistle with some kind of string or rope

17      attached to it so that you can wear it around

18      your neck?

19  A.  Yes.

20  Q.  Is this something that you've worn previous to

21      this day?

22  A.  Yes.

23  Q.  Approximately how many times?

24  A.  Every time I've gone to the range.

94

1   Q.   Was this something that was your own personal
2        property?
3   A.   Yes.
4   Q.   And do you remember when you first got that?
5   A.   When I graduated drill sergeant school.
6   Q.   So approximately how many years have you had this
7        lanyard and whistle?
8   A.   Since 1998.
9   Q.   And what type of firearm was it?
10  A.   I mean, 1988.  I'm sorry.
11                   The firearm that went off?
12  Q.   Right.
13  A.   It was a Glock.  G L O C K.  23.
14  Q.   Who did that belong to?
15  A.   Jamie.
16  Q.   And is that a personal weapon of his?
17  A.   Yes.
18  Q.   And why did you have it?
19  A.   I was demonstrating a technique to the other
20       instructors and to the students before that where
21       my holster was for a Glock but I had showed up to
22       the range with a SIG with an off-duty holster but
23       I needed a complete duty rig and that's where the
24       Glock came into play because my duty rig was for

95

1          -- my duty weapon was for a Glock.

2   Q.   So what was the duty weapon that you wanted to

3        demonstrate on?  That was a Glock?

4   A.   A Glock 23.

5   Q.   Why didn't you bring a holster for a Glock?

6   A.   I had a holster for a Glock.

7   Q.   I'm sorry.  Strike that.  Why didn't you bring a

8        Glock if you brought a holster for a Glock?

9   A.   Weapon of choice that day.  Just grabbed a weapon

10       out of the safe.

11  Q.   So did you bring one of your personal weapons to

12       the --

13  A.   It's all I ever use on -- when I work for the

14       state, I use personal weapons.

15  Q.   And why is it that when you work for the state

16       you use personal weapons?

17  A.   You never bring your duty weapon to a state job

18       because your duty weapon is for your job in your

19       town.

20  Q.   Since this accidental firearms discharge in April

21       of 2016, have you served as any type of training

22       officer?

23  A.   No.

24  Q.   Is that something where the department has

102

1      back to the 38 revolvers.  Others with the 9

2      millimeter Beretta.

3  Q.  How old is the police station?

4  A.  1970s.

5  Q.  Other than Mitchell, are --

6  A.  He's the only one I'm 100 percent sure on.

7  Q.  But you think maybe there were some others --

8  A.  Prior to my employment.

9  Q.  Prior to your employment.

10             And that's based on just seeing holes

11     in the department?

12 A.  And old-timer stories.

13 Q.  So your accidental discharge, I think you said

14     Jamie Griffin?

15 A.  Yes.

16 Q.  Who initially investigated that?

17 A.  The Department of Defense police.

18 Q.  Were the State Police involved?

19 A.  They were.

20 Q.  To your knowledge, what did the Department of

21     Defense State Police do?

22 A.  The Department of Defense took over the initial

23     investigation.  Then they turned it over to

24     criminal investigation department at West

103

```
 1      Point --
 2  Q.  And --
 3  A.  -- and then Mass. State Police got involved.
 4  Q.  Did the Department of Defense or the criminal
 5      investigation from West Point, did they write a
 6      report or come to any conclusions that you're
 7      aware of?
 8  A.  They did.
 9  Q.  And have you seen those documents?
10  A.  I have.
11  Q.  And what was their assessment or their
12      determination?
13  A.  It was deemed a training accident.
14  Q.  Did the State Police conduct a separate
15      investigation or was this something the DOD
16      handed off?
17  A.  It was a separate investigation.
18  Q.  What was it that the Department of Defense, what
19      was it they were investigating?
20  A.  They were investigating the range accident.
21  Q.  To see whether it was an accident or were they
22      applying any policies or procedures?
23  A.  You would have to ask them for specifics.  I only
24      can go by what I read in the report.
```

104

1   Q.   What was it that the State Police was

2        investigating?

3   A.   To see if there were going to be pending any

4        criminal charges.

5   Q.   So the State Police to your knowledge were

6        investigating a potential crime?

7   A.   Yes.

8   Q.   And what was their determination?

9   A.   Training accident.  No malice.

10  Q.   And then the Gloucester Police Department

11       conducted an investigation at some point?

12  A.   Yes.

13  Q.   And have you ever served in internal affairs?

14  A.   No.

15  Q.   Is it your understanding that internal affairs

16       investigates to see whether officers have

17       violated department policies?

18  A.   I have no knowledge of what internal affairs

19       does.

20  Q.   Okay.  So it's fair to say you just don't know

21       one way or the other what internal affairs does

22       or what their role is?

23  A.   Correct.

24  Q.   At some point the Gloucester Police Department

105

1     conducted its own investigation?

2  A.  They did.

3  Q.  And what was the determination in that

4     investigation?

5  A.  I don't know what the Gloucester Police

6     Department's results were from their

7     investigation.

8  Q.  Who conducted the Gloucester Police Department's

9     investigation?

10 A.  Originally it started off with the detectives

11    division so I don't know what happened

12    internally.

13 Q.  And then what happened?

14 A.  When they hired a private investigator, I believe

15    in his ruling on the last page it says unfounded.

16 Q.  Do you take issue with the Gloucester Police

17    Department conducting an investigation?

18 A.  Do I take an issue with it?

19 Q.  Yeah.

20 A.  I took an issue with the time it took them to

21    conduct one.

22 Q.  How long did it take them?

23 A.  They had already had -- they didn't start it

24    until over 60 days into the administrative leave.

106

1  Q.  Was that at the conclusion of the State Police's
2      investigation?
3  A.  Yes.
4  Q.  So the Gloucester Police Department waited until
5      the criminal investigation was over before
6      conducting its own investigation?
7  A.  Correct.
8  Q.  Is it your understanding that that's typically
9      how those things work or do you not have any
10     knowledge of that?
11 A.  The way the Gloucester Police Department does
12     their investigations and still do them to this
13     day is they go after you right away.  You're put
14     on administrative leave regardless of the results
15     from any other agency and then they do their own
16     thing.
17 Q.  Do you know why or have an understanding as to
18     why an outside investigator was hired to conduct
19     your accidental discharge investigation?
20 A.  Mine personally?
21 Q.  Right.
22 A.  No.
23 Q.  Do you have any thoughts or opinions or views on
24     that one way or the other?

109

1    A.   I believe it is excessive, yes.

2    Q.   And do you have any allegations or any

3         understanding as to why the investigation took

4         about 100 days?

5    A.   I do not because I do recall reading an email

6         from Lenny Campanello to Donna Lette wanting to

7         expedite this thing to get me back to work and

8         the City had still not hired a private

9         investigator yet so that was the chief reaching

10        out to City Hall for guidance on what to do.

11                  I don't know the exact date but I know

12        it was well within the 102 days that I was out.

13   Q.   So fair to say you don't know why the City's

14        investigation took 100 days?

15   A.   Correct.

16   Q.   Do you allege any wrongdoing on the part of the

17        City or the department in taking about 100 days

18        for your investigation?

19   A.   I do.

20   Q.   What do you allege?

21   A.   I allege that the time off -- the time out was

22        excessive, especially when you're on home

23        confinement.

24   Q.   Why do you allege they were doing this to you?

113

1   A.   Correct.

2   Q.   And I think you had said it's about

3        three-quarters of the officers that are jealous

4        of your military service and in some way have

5        made comments about that?

6   A.   When I had first started the job, we were -- the

7        veterans were the minority.  There were very few

8        of us in the department.  And the guys I hung out

9        with and talked to were Vietnam veterans and

10       there were very few of them.

11                And we all stuck together, which made

12       it obvious that I'm with this group because of my

13       military service.  So when they were attacking

14       me, they were attacking me for my military

15       service.

16  Q.   What percentage of the department currently are

17       veterans or have served in the military in some

18       way?

19  A.   You'd have to refer to City Hall for the exact

20       number.  I can honestly tell you from my watch

21       that we're probably 50/50 but department-wide I

22       wouldn't have any knowledge.

23  Q.   Your current watch I think you said is midnights?

24  A.   Yes.

114

1   Q.   And how many officers are typically on your
2        watch?
3   A.   Thirteen.
4   Q.   And of those 13 officers, approximately half of
5        them served in the military?
6   A.   Yes.
7   Q.   Which branches?
8   A.   Army, Navy, Coast Guard.
9   Q.   You're including that now?
10            All right.  What else?
11  A.   It's still a branch.
12            Um, trying to think if there's anyone
13       --
14            That's pretty much it.
15  Q.   I think you had testified that since the
16       accidental shooting you have not served in any
17       role as a trainer or firearms instructor.  Is
18       that true?
19  A.   That's correct.
20  Q.   Do you allege that you should be allowed to act
21       as a firearms instructor?
22  A.   I hold the highest level of firearms trainers in
23       the department.  I'm a level 4 firearms
24       instructor and I was the assistant firearms

1   Q.  Did you ever put down or expend any money for

2       either of these businesses?

3   A.  I had bought -- for Practical to Tactical I had

4       bought 13 handguns at 475 apiece to teach the

5       course with.

6   Q.  And what did you do with those handguns?

7   A.  I have since sold them because I can't teach so

8       there's no need to keep them around.

9   Q.  How much did you sell them for?

10   A.  Less than half of what they're worth because the

11       dealers don't give you what they're worth.

12   Q.  Do you allege that other police officers dumped

13       leaves in a similar way that you did?

14   A.  I don't recall any.

15   Q.  You make an allegation regarding some officers

16       wearing Free Cliffy shirts?

17   A.  Yes.

18   Q.  Who are those officers?

19   A.  Officer Moseley, Officer Chipperini and Officer

20       Simoes.

21   Q.  What's the allegation?

22   A.  I was under house arrest.  I couldn't leave my

23       house between four and 12 every day and these

24       guys already knew that the City had the -- had

180

1    Q.   What is his race?

2    A.   He is a black male.

3    Q.   Was he on administrative leave at some point?

4    A.   He was but 19 years ago.

5    Q.   Why was he on administrative leave?

6    A.   I have no knowledge on why.  I just knew he was.

7         When I went to war, he was on administrative

8         leave.  When I came back, he was still on

9         administrative leave.

10   Q.   Do you have any understanding as to why he was

11        placed on administrative leave?

12   A.   I have no idea.

13   Q.   So it's your understanding that Officer Lamberis

14        was alleging that he was being discriminated

15        against based on race?

16   A.   Yes.

17   Q.   If you can look at the second paragraph.  The

18        second sentence.  The second sentence reads --

19   A.   I feel it was just a continuation of the

20        harassment I've been dealing with at work placed

21        on me by management since 2016.

22   Q.   What is it that started in 2016?

23   A.   Lenny became chief or something like that.

24   Q.   And that's when you alleged harassment started?

181

1   A.   I never had any issues up until that point.

2   Q.   The next paragraph so it's the third full

3        paragraph.  You can read that to yourself,

4        please.

5   A.   Go ahead.

6   Q.   What did you mean by that?

7   A.   My street sergeant came up to me.  Sergeant

8        Catarino.  He said to Lieutenant Quinn, who was

9        in charge of the awards, "Officer Alves obtained

10       a picture of the suspect from" --

11                 It's not in the report but you're

12       asking what happened so I'm telling you.

13  Q.   I'm asking what you meant by that paragraph.

14  A.   What I meant by that paragraph is as pointed out,

15       the administration passed --

16                 Once you are labeled as a bad person,

17       the department treats you differently.

18  Q.   And who was doing the labeling?

19  A.   Lieutenant McCarthy -- I mean Deputy Chief

20       McCarthy, Lieutenant Quinn and Chief Campanello.

21       The three guys that were in a position to do it.

22  Q.   And approximately how many officers were in the

23       good category and approximately how many were in

24       the bad category in your view?

222

1  A.  That's what I had heard.  I heard it secondhand.
2      I didn't hear it directly from in there.
3  Q.  Because you weren't working at the time the
4      statement was made?
5  A.  Correct.
6  Q.  But it was passed on to you from those --
7  A.  It was passed on from watch commander to watch
8      commander to where all three watches knew what
9      was going on.
10 Q.  Do you know the period of time during which Chief
11     Campanello was the chief of the department?
12 A.  I know it ended in 2016.  Around October.
13 Q.  And --
14 A.  And I'm going to say he was probably chief for
15     five years --
16 Q.  Would it --
17 A.  -- but it may be a little longer.  I'm not 100
18     percent sure.
19 Q.  Or a little shorter?
20 A.  Yes.
21 Q.  All right.  Will you accept my representation to
22     you that he was hired in October of 2012?
23 A.  I don't know his start date so if you're telling
24     me it was 2012, I would take you on your word.

223

1   Q.  Well, okay.  Thank you for that but I'm asking,

2       does that refresh your recollection?

3   A.  I don't know the exact date he started.

4   Q.  Would it surprise you if I said he was placed on

5       administrative leave and last worked as the chief

6       of police in Gloucester on September 6, 2016?

7   A.  Yes.

8   Q.  You recall that date?

9   A.  Yes.

10  Q.  And sometime after that he either resigned or he

11      was terminated after being placed on

12      administrative leave?

13  A.  After being placed on administrative leave, they

14      conducted an investigation.  The City -- from

15      what I understand -- just let him retire and paid

16      him his retirement.

17  Q.  But the last day that he actually worked as the

18      police chief having authority and making --

19      directing the operations of the department was

20      September 6, 2016?

21  A.  Okay.  I don't know the exact date but I know

22      September 11th he wasn't there for the ceremony.

23      He had already been replaced by Deputy Chief

24      McCarthy.