UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CLIFFORD ALVES, JR., AND
TROY SIMOES,
     Plaintiffs,


     v.                                   CIVIL ACTION NO. 18-10654-MPK[1]


CITY OF GLOUCESTER, THE GLOUCESTER
POLICE DEPARTMENT, AND POLICE
CHIEF LEONARD CAMPANELLO,
     Defendants.


ORDER ON DEFENDANT CITY OF GLOUCESTER'S
MOTION FOR SUMMARY JUDGMENT (#79).


KELLEY, U.S.M.J.

I. Introduction.

     Clifford Alves, Jr., and Troy Simoes are employed by the City of Gloucester as police

officers and previously served in the active duty and reserve components of the United States

Armed Forces. In the operative, first amended complaint ("FAC"), Alves and Simoes allege that

the City of Gloucester and Police Chief Leonard Campanello violated the Uniformed Services

Employment and Reemployment Act ("USERRA"), 38 U.S.C. §§ 4301-4335 in Count I (Alves)

---

[1] With the parties' consent, this case has been assigned to the undersigned for all purposes,
including trial and the entry of judgment, pursuant to 29 U.S.C. § 636(c). (#17.)

and Count II (Simoes), and violated 42 U.S.C. § 1983 in Count III (Alves) and Count IV (Simoes). (#21 ¶¶ 157-164.)[2]

The City and Campanello previously moved to dismiss the FAC under Fed. R. Civ. P. 12(b)(6). (##24, 26.) Plaintiffs opposed the motions. (#28.) On January 18, 2019, the court denied the motions to dismiss Counts I and II, finding that the FAC plausibly stated USERRA claims as to both Alves and Simoes. (#37 at 8-13.) Partly because defendants belatedly raised an argument that the USERRA claims preempt the § 1983 claims, the court denied the motions to dismiss Counts III and IV without prejudice to renewal. *Id.* at 14.

The City and Campanello subsequently moved for judgment on the pleadings as to Counts III and IV under Fed. R. Civ. P. 12(c), again raising the argument that the USERRA claims preempt the § 1983 claims. (##64, 65.) Plaintiffs opposed. (#66.) The court deferred ruling, and the motion was denied without prejudice to renewal after decision on anticipated motions for summary judgment. (##68, 75.)

On February 10, 2021, the City moved for summary judgment. (##79-81, 89.)[3] Plaintiffs oppose. (#86.) For the reasons set out below, the City's motion for summary judgment (#79) is allowed in part and denied in part.

II. <u>Facts</u>.

The City filed a statement of undisputed facts with attachments. (#81.) In response, plaintiffs disputed three of the City's facts and added further disputed facts and attachments. (#86.) In reply, the City addressed one of plaintiffs' disputes and added further attachments. (#89.) The

---

[2] The Gloucester Police Department is a named defendant. The court previously ruled that, because the Gloucester Police Department is not a suable entity, it will treat those claims as claims against the City. *See* #37 at 14-15.

[3] Campanello has not moved for summary judgment.

City did not respond to the additional facts that plaintiffs provided in their statement. Where supported by the record and in the absence of a response from the City, the court will determine that material facts presented by plaintiffs as being disputed do, in fact, create a genuine dispute for the purposes of summary judgment. *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 15 n.2 (1st Cir. 2016) (deeming distinct facts propounded by opposing party and supported by evidence to have created a dispute and drawing reasonable inferences in favor of opposing party).

Plaintiffs' opposition memorandum sets forth additional facts not included in their statement of additional facts. *See, e.g.*, #86 at 6-10. Including additional facts in an opposition brief is contrary to this district's local rules of summary judgment, which require "[a] party opposing the motion [to] include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation." Local Rule 56.1. "Such rules are designed to function as a means of 'focusing a district court's attention on what is—and what is not—genuinely controverted.'" *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 7 (1st Cir. 2007) (quoting *Calvi v. Knox County*, 470 F.3d 422, 427 (1st Cir. 2006)). "Anti-ferret rules are intended to reduce the burden on trial courts and 'prevent parties from unfairly shifting the burdens of litigation to the court.'" *Advanced Flexible Circuits, Inc. v. GE Sensing & Insp. Techs. GmbH*, 781 F.3d 510, 520-521 (1st Cir. 2015) (quoting *Cabán Hernández*, 486 F.3d at 8). "Given the vital purpose that such rules serve, litigants ignore them at their peril." *Cabán Hernández*, 486 F.3d at 7.

The court will not consider any facts included in plaintiffs' opposition but not in their statement of additional facts for purposes of summary judgment. *See Schultz v. Kelly*, 188 F. Supp. 2d 38, 49-50 (D. Mass. 2002) (disregarding fact contained in memorandum as "not properly before

the court" where it was "not included in either Plaintiffs' Statement of Material Facts, their Local Rule 56.1 Response or their ninety-nine paragraph Local Rule 56.1 Statement in support of their cross motion for summary judgment"), *report and recommendation adopted*, 188 F. Supp. 2d 38, 40 (D. Mass. 2002); *see also Latimore v. Trotman*, No. 14-cv-13378-MBB, 2021 U.S. Dist. LEXIS 231606, at *6 (D. Mass. Dec. 3, 2021) (citing *Cabán Hernández* with reference to Local Rule 56.1 of the District of Massachusetts).

For purposes of summary judgment, the facts are presented in the light most favorable to Alves and Simoes, the nonmoving parties. *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 855 (1st Cir. 2008). The facts below are undisputed unless otherwise indicated.

Campanello became chief of police of the Gloucester Police Department ("GPD") in 2012 and served in that capacity until September 2016. (#81 ¶¶ 6, 94.) John McCarthy served as a police officer with the GPD for thirty-nine years. *Id.* ¶ 49. He was appointed to deputy chief of police in 2014 and, after Campanello retired, he served as interim chief. *Id.* ¶¶ 51-52. McCarthy retired as chief of police in 2019. *Id.* ¶ 50. Many GPD officers have served in the military, including approximately half of the officers on Alves' shift. *Id.* ¶¶ 4, 75. When an officer was deployed, it prevented other officers from taking time off from work. (#86-1 ¶ 1.)

A.  Incidents Specific to Alves.

Alves served in the military from 1983 to 1987 in active duty and then was in the reserves until 2006 or 2007. (#81 ¶¶ 1, 3.) He has not served in the military in any capacity since then. *Id.* ¶ 3. He graduated from the police academy in March 1999. *Id.* ¶ 2. Alves testified that he experienced harassment by GPD management, including by Campanello. *Id.* ¶¶ 5-7. The City treated Alves differently than it treated other officers, including officers who were deployed through the military. *Id.* ¶ 8; #86-1 ¶¶ 2-3. Alves speculates that this difference in treatment may

have been due to his position as a union representative. (#81 ¶¶ 8-9.) Alves states that he retired from the military due to harassment from defendants. (#86-1 ¶ 1.) He experienced harassment due to his military service, was treated differently by the GPD because he was a union representative, and was removed from coveted assignments because he filed grievances as a union representative. *Id.* ¶¶ 4-5, 7. Alves testified that Campanello used to treat union presidents well if they did not file grievances. *Id.* ¶ 8; #86-2 at 14. He also testified that Campanello reprimanded some officers for engaging in certain conduct but did not reprimand others. (#86-1 ¶ 6; #86-2 at 12.)

Other officers made disparaging comments to Alves about his military service. For example, they mocked his service, complained that they could not get time off because of his service, denied him the opportunity to participate in military ceremonies, suggested that he was only hired by the GPD because of his service, and that they hoped he would return from his deployment in a body bag. (#86-1 ¶¶ 9-11, 13.) A City official told Alves that his deployment to a war zone had been a vacation and that he therefore should not request vacation time. *Id.* ¶ 12.

On October 1, 2016, the director of the City's Department of Public Works ("DPW"), Michael B. Hale, contacted McCarthy and sent him photographs of a person with a pickup truck dumping leaves and grass outside of a closed composting facility. (#81 ¶¶ 35-36.) Hale wanted the perpetrator, Alves, to be charged with illegal dumping. *Id.* ¶¶ 37-38. Alves was placed on paid administrative leave so that the department could investigate the dumping, while another person unaffiliated with the GPD was charged with illegal dumping and fined $300. *Id.* ¶¶ 39-40. Alves told the GPD that he had permission to illegally dump his refuse because, 12-15 years earlier, DPW employees had told him he could. *Id.* ¶ 41. He cannot recall any other police officers illegally dumping yard waste as he did. *Id.* ¶ 42. Alves filed a grievance with the union and was ultimately

suspended for one day without pay, with a copy of the investigation and disciplinary action placed in his personnel file. *Id.* ¶ 43.

Alves felt, in general, that McCarthy was "out to get" him but the reason for this was "personal." (#81 ¶ 47; #81-1 at 11-12.) Alves felt that McCarthy held patrol officers like him to a higher standard than supervisory officers, and held them accountable in situations when he did not hold supervisory officers accountable. (#81 ¶¶ 44-45.) McCarthy once said that he saw no reason for patrolmen (like Alves) to make more than retired lieutenants who were on a detail. *Id.* ¶ 46.

Alves was a police firearms instructor from 2004 until 2016. (#81 ¶ 17.) On April 13, 2016, while serving as the lead instructor for the Randolph Police Academy at Fort Devens (which was "outside employment" not affiliated with the GPD), Alves accidentally shot a fellow instructor. (#81 ¶¶ 10, 18-19.) Campanello placed Alves on paid administrative leave pending the results of an investigation into the accidental shooting. *Id.* ¶ 96. The incident was investigated by the Department of Defense, the criminal investigation department at West Point, and the State Police. *Id.* ¶¶ 20-22. Once these investigations were complete, the GPD conducted an internal investigation using a third-party investigator, Al Donovan. *Id.* ¶¶ 23-24. Donovan recommended that Campanello suspend Alves' license to carry ("LTC") as a result of the incident because a civilian's LTC would be suspended under similar circumstances. *Id.* ¶ 26.

Alves received notice of this internal investigation from Campanello on May 13, 2016. (#81 ¶ 25.) Alves was told that, during the internal investigation, his LTC would be suspended, he would not be allowed to perform outside employment, and that he would be contacted for a fitness for duty evaluation. *Id.* ¶ 27. The City offers several contradictory facts: first, that Campanello sent an email to the GPD's human resources director, Donna Leete, asking her to expedite the investigation so that Alves could return to work. *Id.* ¶ 29. Second, that Campanello "took steps to

slow the process down" in order to make sure there was a proper investigation. *Id.* ¶ 95. Third, that Campanello was unhappy that the investigation took three months to complete. *Id.* ¶ 99. Campanello contends that he wanted to get to the bottom of what had happened to ensure that Alves could safely return to work. *Id.* ¶ 97. Alves disputes this and believes Campanello's real motivation was discriminatory. (#86-1 at 2.)

Paul L'Italien took over the investigation from Donovan, and on July 7, 2016, he issued his findings. (#81 ¶¶ 28, 30.) L'Italien found insufficient evidence of a violation of department policy against Alves because no witness saw Alves' firearm discharge and strike the victim, and that Alves' explanation for the accident was "possible." *Id.* ¶¶ 31-32. On July 20, 2016, L'Italien interviewed Alves a second time, and issued a supplemental report the following day. *Id.* ¶ 34. After the investigation was complete, Alves returned to work on full-time status. *Id.* ¶ 98. Campanello did, however, rescind Alves' approval to engage in outside employment as a firearms instructor. *Id.* ¶ 100. Alves has not worked as a firearms instructor since the 2016 accident. *Id.* ¶ 16. The City contends that Campanello's decision to rescind approval was based on the circumstances of the accidental shooting, while Alves believes Campanello's real motivation was discriminatory. *Id.* ¶ 100; #86-1 at 2-3.

On September 1, 2016, Alves filed a complaint with the GPD's human resources department that alleged "unfair treatment and harassment," though he did not allege that this treatment or harassment was connected to his military service. (#81 ¶¶ 11-12.) On January 13, 2018, Alves filed a complaint with then-Chief McCarthy, alleging discrimination and harassment because he was not included with another officer in a commendation. *Id.* ¶ 13. He did not allege that this discrimination or harassment was due to his military service, though he did allege that it was "a continuation of the harassment" he had been experiencing since 2016. *Id.* ¶¶ 14-15.

B.  <u>Incidents Specific to Simoes</u>.

Simoes served in an active-duty capacity for the U.S. Coast Guard from 2002 until 2006, and served as a reservist from 2006 until 2014. (#81 ¶ 55.) He began working as a police officer for the GPD in May 2012. *Id.* ¶ 56. Campanello had others in the GPD harass Simoes because of his Coast Guard service. (#86-1 ¶¶ 14, 16.) Supervisors at the GPD often told Simoes that Campanello did not like Simoes' military service, that his service was costing the City money, and that they wanted him to resign from service. *Id.* ¶ 17.

McCarthy told Simoes that he needed to give his Coast Guard training schedule to his watch commander in advance because it cost the department money to hold officers over on shifts or give discretionary time off. (#81 ¶ 54.) For his annual two-week active-duty training with the Coast Guard reserves, Simoes would submit his military orders to the GPD. *Id.* ¶ 76. When the dates of these scheduled trainings changed, the Coast Guard would send Simoes a text or call him, therefore he did not have documentation to give GPD. *Id.* ¶¶ 77-78.

In June 2014, Simoes and other officers were receiving "slow pay" for details, that is, their pay was delayed. (#81 ¶¶ 84-85.) Simoes did not receive pay until over two months after performing five details. *Id.* ¶ 86. Campanello's secretary did not issue payment for these details, so Simoes went to someone else who fixed the problem and issued his payments. *Id.* ¶ 87. After that, Simoes never had a problem with slow payments. *Id.* A week after the payment problem was resolved, as Campanello's secretary walked past Simoes, she purposely and aggressively dropped her shoulder into his. *Id.* ¶ 88. Also in June 2014, Simoes testified that Campanello and McCarthy persistently harassed him about his weekend training with the Coast Guard reserves. *Id.* ¶ 89. This harassment escalated when Campanello purposefully and aggressively dropped his shoulder into Simoes in retaliation for not providing his training schedule. *Id.*

Simoes passed the sergeant's exam in 2014. (#81 ¶ 92.) The parties dispute whether the GPD's 2015 budget would have allowed for his promotion to that position. *Id.*; #86-1 at 2. The GPD did not fill any sergeant position vacancies in fiscal years 2015 or 2016. (#89 at 2.) Simoes did not grieve the fact that he was not promoted with the union. *Id.* In 2015 or 2016, McCarthy asked Simoes to apply for a position as the GPD's secondary boat operator. (#81 ¶¶ 79-80.) After Simoes requested a detail officer during a winter storm, however, McCarthy told him not to bother applying. *Id.* ¶ 80. Even so, Simoes is now the secondary boat operator. *Id.* ¶ 82.[4] Kevin Mackey, the primary boat operator, served in the Coast Guard and has worked for the GPD for twenty years. *Id.* ¶ 81.

Simoes was never disciplined or reprimanded by the GPD, though he was investigated for cancelling an overtime shift and to determine whether he had informed the media about an issue. (#81 ¶¶ 57-58.)[5] As to the first incident, Simoes and another officer, Michael Quinn, were investigated for removing themselves from motorcycle duty for a parade without prior notification. *Id.* ¶ 59. Michael Quinn has not served in the military. *Id.* ¶ 63. On June 27, 2016, both officers were asked to answer written questions about the incident. *Id.* ¶¶ 62, 64. In his responses, Simoes did not claim that actions taken against him for the incident were due to his military service. *Id.* ¶ 65. A lieutenant in the GPD reported that the two officers had created a safety issue by not showing up for their assignment, though neither of them were disciplined or punished. *Id.* ¶¶ 60-61. In connection with the second incident involving a media leak, Simoes and other officers were

---

[4] The City's statement of facts indicates that Simoes is now the secondary boat operator, but does not state when he applied for or was hired into that position. *See* #81 ¶ 82. Plaintiffs' statement of additional facts did not clarify the timing, either. *See* #86-1.

[5] Plaintiffs do not dispute this fact, though Simoes has alleged that he was suspended for wearing the "Free Cliffy" t-shirt discussed below.

asked to submit responses to written questions. *Id.* ¶¶ 66-67. Simoes was not interviewed nor was he disciplined as a result of the investigation. *Id.* ¶ 68.

In the spring of 2016, when Alves was on administrative leave during the investigation into the accidental shooting, Simoes wore a t-shirt printed with "Free Cliffy" to a union meeting held at the GPD to show his support for Alves. (#81 ¶¶ 69-70.) Simoes felt that the investigation was taking too long. *Id.* ¶ 71. He and three other officers were removed from their assignments as firearms instructors for one week because they wore these t-shirts. *Id.* ¶ 72. After submitting a grievance, the officers were returned to the assignments one week later by the City's legal counsel. *Id.* ¶ 73. Simoes does not allege having lost any pay as a result of the suspension. *Id.* ¶ 74.

In August 2016, Simoes submitted a complaint about the slow payments, harassment around his military training schedule, and several other issues unrelated to his military service. (#81 ¶¶ 83-84, 90.) In February 2017, he submitted another complaint that was unrelated to his military service. *Id.* ¶ 91. Campanello harassed Simoes for filing grievances and threatened him for filing complaints. (#86-1 ¶¶ 15, 18.) At one time, Leete told Simoes that Campanello would promote him if he dropped his complaints. *Id.* ¶ 19; #86-3 at 13. Simoes has been on injured leave since December 2019. (#81 ¶ 93.)

## III. Standard of Review.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail on a motion for summary judgment, the moving party bears the initial burden of averring the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citations omitted). Once the moving party asserts the absence

of a genuine issue of material fact, the non-movant must demonstrate the existence of a factual dispute with requisite sufficiency to proceed to trial. *Fontánez-Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 54–55 (1st Cir. 2006). "[I]mprobable inferences, conclusory allegations, or rank speculation" cannot alone defeat summary judgment. *Id.* (quoting *Ingram v. Brink's, Inc.*, 414 F.3d 222, 229 (1st Cir. 2005)).

In determining whether summary judgment is proper, courts view the record in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in the nonmovant's favor. *Burns v. Johnson,* 829 F.3d 1, 5, 8 (1st Cir. 2016). Upon a party's motion, Rule 56 requires the entry of summary judgment where a party fails to establish the existence of any one essential element on which that party will bear the final burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986)). "At summary judgment, 'the judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Burns*, 829 F.3d at 8 (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

IV. <u>Discussion</u>.

A.  <u>Liability Under USERRA</u>.

USERRA prohibits employment discrimination on the basis of an employee's military status; it applies to both reservists and active-duty service members. *See generally* 38 U.S.C. §§ 4301-4335. In addition to prohibiting discrimination, the statute's purpose is to encourage noncareer military service and to minimize disruption to the lives of persons performing military

11

service as well as to their employers. *Id.* § 4301(a). USERRA achieves this goal by means of its anti-discrimination provision, which provides:

> A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

*Id.* § 4311(a). The First Circuit has held that "USERRA's provisions 'should be broadly construed in favor of military service members as its purpose is to protect such members.'" *Rivera-Melendez v. Pfizer Pharm., LLC*, 730 F.3d 49, 54 (1st Cir. 2013) (quoting *Vega-Colón v. Wyeth Pharms.*, 625 F.3d 22, 26 (1st Cir. 2010)).

To assert a USERRA discrimination claim, an employee must allege that he or she suffered an adverse employment action and that his or her military service was "at least a motivating or substantial factor" in the employer's action. *Angiuoni v. Town of Billerica*, 838 F.3d 34, 39 (1st Cir. 2016) (quoting *Velázquez-García v. Horizon Lines of P.R.*, 473 F.3d 11, 17 (1st Cir. 2007)); *see Conners v. Billerica Police Dept.*, 679 F. Supp. 2d 218, 227 (D. Mass. 2010). The First Circuit has defined an adverse employment action for purposes of USERRA as one that affects a plaintiff's employment or that alters the conditions of the workplace. *Vega-Colon*, 625 F.3d at 33. Discriminatory motivation under USERRA can be shown by direct or circumstantial evidence, including, for example, (i) proximity in time between the employee's military activity and the adverse employment action; (ii) inconsistencies between the employer's proffered reasons and other actions of the employer; (iii) an employer's expressed hostility towards people protected by USERRA, together with knowledge of the employee's military activity; and (iv) disparate treatment of USERRA-covered employees compared with non-military employees with similar work records or offenses. *Angiuoni*, 838 F.3d at 17 (citing *Sheehan v. Dept. of Navy,* 240 F.3d

1009, 1014 (Fed. Cir. 2001)); *see also Conners,* 679 F. Supp. 2d at 226 (citing *Sheehan,* 240 F.3d at 1014).

If the employee establishes, through direct or circumstantial evidence, that his or her military status was a motivating or substantial factor in the employer's action, USERRA shifts the burden of proof to the employer to show, by a preponderance of the evidence, that it would have taken the adverse employment action despite the employee's protected status. *Angiuoni*, 838 F.3d at 39; *Kane v. Town of Sandwich*, 123 F. Supp. 3d 147, 154-155 (D. Mass. 2015). "[U]nder USERRA, the employee does not have the burden of demonstrating that the employer's stated reason is a pretext. Instead, the employer must show, by a preponderance of the evidence, that the stated reason was not a pretext; that is, that 'the action *would* have been taken in the absence of [the employee's military] service.'" *Velazquez-Garcia*, 473 F.3d at 17 (quoting 38 U.S.C. § 4311(c)).

## B. Alves' USERRA Claim (Count I).

The City argues that Alves cannot support his claim for discrimination in violation of USERRA because the incidents Alves cites involved legitimate actions taken by the GPD and were unrelated to an intent to discriminate against him on the basis of his military service. (#80 at 4-8.)[6]

---

[6] From the amended complaint, it appears that plaintiffs did not intend to pursue a hostile work environment theory in connection with their USERRA claims. *See* #21. Nor was a hostile work environment theory briefed at the motion to dismiss stage. *See* ##25, 27-28, 37. Even if plaintiffs intended to pursue it, having failed to address the City's arguments in support of summary judgment on this theory (#80 at 11-12), summary judgment would have been appropriate on that ground. *See Montany v. Univ. of New England*, 858 F.3d 34, 41 (1st Cir. 2017) (noting that failure to oppose summary judgment on a claim constituted abandonment of that claim); *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995) ("By failing to make this argument in his opposition to summary judgment, [plaintiff] has failed to preserve this claim. . . . Even an issue raised in the complaint but ignored at summary judgment may be deemed waived."); *Frady v. C. R. Bard, Inc.*, No. 1:19-cv-12549-ADB, 2020 U.S. Dist. LEXIS 76168, at *7 (D. Mass. Apr. 30, 2020) (finding that "Plaintiff has . . . waived several claims by failing to address them in her opposition to Defendant's motion" for summary judgment). As a final point, the First Circuit has

Alves testified that both before and after his retirement from service, GPD staff made negative comments to him about his military service. "[S]tray remarks by nondecisionmakers, while insufficient standing alone to show discriminatory animus, may still be considered 'evidence of a company's general atmosphere of discrimination,' and thus can be relevant . . . ." *Velazquez-Garcia*, 473 F.3d at 18-19 (quoting *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000)). The court thus considers these comments in the context of summary judgment as relevant, but certainly not determinative.

With regard to specific discriminatory actions taken against him, Alves' allegations primarily concern those taken in connection with the accidental shooting.[7] During the three-month investigation into Alves' accidental shooting of a fellow firearms instructor while Alves was working outside of the GPD, Alves was suspended from duty, his LTC was suspended, and he was not allowed to engage in any outside employment. Arguably, the three-month investigation took longer than was necessary and in fact prompted other officers to protest the investigation by wearing "Free Cliffy" t-shirts to a union meeting. Ultimately, the investigator concluded that Alves had not violated any GPD policies. In spite of this finding, however, Campanello rescinded Alves' permission to engage in outside employment as a firearms instructor. The City has not provided an explanation as to why the GPD felt it necessary to rescind his ability to continue that separate employment.

---

noted that "[n]either the Supreme Court nor any court of appeals has decided whether a hostile work environment claim is cognizable under USERRA." *Vega-Colon*, 625 F.3d at 32.

[7] Both Alves and Simoes cite several investigations conducted by the GPD that did not result in any disciplinary actions against them, but as the City observes, "[a]n investigation of an employee, without more, is insufficient to constitute an adverse employment action." *Gasperini v. Dominion Energy New England, Inc.*, No. 10-cv-11246-JCB, 2012 WL 2402804, at *12 (D. Mass. June 25, 2012); *see* #80 at 6.

"The issue under USERRA is not whether an employer is 'entitled'" to take an adverse action against an employee "for a particular reason, but whether it would have done so if the employee were not in the military." *Velazquez-Garcia*, 473 F.3d at 20. Although Alves acknowledges that other GPD officers with military backgrounds were treated better than he was, "the failure to treat all members of a class with similar discriminatory animus does not preclude a claim by a member of that class who is so treated." *Velazquez-Garcia*, 473 F.3d at 20. The City has not provided evidence that it would have imposed the same punishment on other officers, for example, by identifying a policy or past precedent for the punishment imposed on Alves. As plaintiffs note, Alves' union activities may have contributed to a discriminatory animus, but whether they did—and whether those activities were a more significant factor for their action than Alves' military service—is a question of disputed fact. *See* #86 at 12-13; *see also Kane*, 123 F. Supp. 3d at 154 ("As a 'motivating factor,' military service need not be 'the sole cause of the adverse employment action.' (quoting *Kelley v. Maine Eye Care Associates, P.A.*, 37 F. Supp. 2d 47, 54 (D. Me. 1999))).

For purposes of summary judgment, where the court must view the evidence in the light most favorable to Alves and draw all reasonable inferences in his favor, the City has failed to show that no reasonable jury could find that the GPD would have taken the same actions regardless of Alves' military service. *See Burns,* 829 F.3d at 8.

### C. Simoes' USERRA Claim (Count II).

The City claims that Simoes has failed to marshal evidence that he suffered from an adverse employment action in violation of USERRA. (#80 at 8.) The primary adverse action that Simoes

alleges is defendants' decision not to promote him to sergeant in 2015.[8] Simoes passed the sergeant's exam in 2014 but was never promoted to sergeant. He testified that Campanello and others made negative comments to him about his military service and the impact of his training schedule on the GPD, and that supervisors suggested he retire from the military. In addition, Simoes testified that he was told Campanello would promote him if he dropped his complaints. Although not entirely clear from the snippets of Simoes' deposition testimony that the parties provided to the court, it appears that the promised promotion was a promotion to sergeant. *See* #81-10 at 61-62 (discussing opportunity where Simoes would have been first in line for promotion); #89 at 2 (stating that Simoes was first in line to be promoted to sergeant).

The City claims that Simoes could not have been promoted in 2015 because there was no money in the budget for the GPD to hire a sergeant, and that—in fact—no one was hired as a sergeant in 2015 or 2016. The document the City cites in support of its position, however, includes notes from a City Council meeting held on May 30, 2014, during which "Campanello said that there are vacancies in the department" and that "it is making two lieutenants and one sergeant for the existing force to supplant retirees." (#81-16 at 3-4.) Given Simoes' testimony regarding GPD officers' and Campanello's attitudes towards his military service, and the promise to promote Simoes if he dropped his complaints (suggesting that promotion was, in fact, a possibility), the City has not met its burden to show that no reasonable jury could find that discrimination about Simoes' military status was a motivating or substantial factor behind the GPD's decision not to promote him to sergeant. *See Scott*, 550 U.S. at 380.

---

[8] Simoes testified that McCarthy told him not to apply for a position as secondary boat operator in 2015 or 2016, but plaintiffs do not dispute that the reason for this was because Simoes requested a detail during a winter storm. In addition, Simoes did—at some time—become the secondary boat operator.

D. Alves' and Simoes' § 1983 Claims: (Counts III and IV).

The City makes three arguments in favor of summary judgment on Counts III and IV. First, the City renews its argument that USERRA preempts these § 1983 claims. (#80 at 12-13.) Second, the City argues that any § 1983 claim predicated on a First Amendment violation related to the "Free Cliffy" t-shirt incident fails as a matter of law because the police officers who were wearing the t-shirts were not speaking on a matter of public concern. *Id.* at 13-14. Third, the City argues that Alves and Simoes cannot prove municipal liability under *Monell v. Dept. of Soc. Serv. of City of N.Y.*, 436 U.S. 658 (1978). (#80 at 15-16.)

1. Section 1983 Claims Related to Military Service Are Preempted.

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 does not create federal rights but instead provides a mechanism for enforcing a right established elsewhere. *Albright v. Oliver*, 510 U.S. 266, 271 (1994); *see Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) ("Plaintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes."). "[T]o sustain a § 1983 action, the plaintiff must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs." *City of Rancho Palos Altos Verdes v. Abrams*, 544 U.S. 113, 120 (2005).

In *Abrams*, *Smith v. Robinson*, 468 U.S. 992 (1984), and *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1 (1981), the Supreme Court held that

certain statutory enactments preempted § 1983 claims after finding that Congress intended those statutes' remedial schemes to "be the exclusive avenue through which a plaintiff may assert [the] claims." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 252 (2009) (alteration in original) (quoting *Smith*, 468 U.S. at 1009). The statutory enactments in each of these three cases provided "an express, private means of redress in the statute itself" that the Supreme Court found to be indicative "that Congress did not intend to leave open a more expansive remedy under § 1983." *Abrams*, 544 U.S. at 121.

The First Circuit has yet to address the preemption of § 1983 claims by USERRA. The court had the opportunity to do so in *Meléndez-García v. Sánchez*, 629 F.3d 25 (1st Cir. 2010), an appeal from a dismissal of a plaintiff's § 1983 claim on the grounds that Congress "implicitly precluded enforcement of [USERRA] violations through § 1983." *Id.* at 40 (alteration in original). Avoiding the preemption issue, the First Circuit concluded: "We need not reach the issue of whether Congress intended to prohibit plaintiffs from bringing section 1983 claims predicated on USERRA violations because the statutory language of the USERRA does not appear to protect against the types of violations that [plaintiff] alleges occurred." *Id.*

The Second Circuit addressed the issue directly in *Morris-Hayes v. Board of Education*, 423 F.3d 153 (2d Cir. 2005). The court held that "USERRA is not a statute for which redress is available against [] Individual Defendants under § 1983." *Id.* at 159. The Second Circuit adopted the approach employed by the Supreme Court in *Abrams*, and determined that "USERRA provides a comprehensive remedial scheme to ensure the employment and reemployment rights of those called upon to serve in the armed forces of the United States." *Id.* at 160. Further, again relying on the Supreme Court's opinion in *Abrams*, the Second Circuit found that USERRA's savings clause provided no benefit to the plaintiff, and that it did not preserve her § 1983 claims. *Id.* at 161.

A significant number of courts have dismissed or granted summary judgment for a defendant where a plaintiff's § 1983 claims arose out of the same facts as his or her USERRA claim. *See Violetto v. Village of Tinley Park*, 130 F. Supp. 3d 1179, 1186 (N.D. Ill. 2015) (noting that "because USERRA establishes a statutory regime under which [the plaintiff] could pursue a private right of action . . . and because the factual claims underpinning both causes of action are identical, [the plaintiff's] § 1983 claim is precluded by his USERRA claim."); *Bello v. Village of Skokie*, No. 14-cv-1718, 2014 U.S. Dist. LEXIS 121664, at *21 (N.D. Ill. Sep. 2, 2014) (concluding "that USERRA's comprehensive remedial structure reflects congressional intent to supersede a plaintiff's ability to assert parallel claims under section 1983"); *Slater v. Verizon Communs., Inc.*, No. 04-cv-303, 2005 U.S. Dist. LEXIS 3270, at *12-13 (D.N.H. Mar. 3, 2005) (stating that comprehensive remedial scheme of USERRA "thus depriv[es] a USERRA plaintiff of a separate constitutional claim arising out of the same operative facts"); *Harris v. City of Montgomery*, 322 F. Supp. 2d 1319, 1329 (M.D. Ala. 2004) (finding that a plaintiff's Fourteenth Amendment equal protection claims were identical to his USERRA claims, and therefore redundant, "[b]ecause USERRA provides a comprehensive remedial scheme for discrimination on the basis of military service"); *Satterfield v. Borough of Schuylkill Haven*, 12 F. Supp. 2d 423, 437 (E.D. Pa. 1998) (granting summary judgment for defendant where "[p]laintiff's equal protection claim hinges upon his status as a military reservist. . . . [USERRA] provides its own comprehensive enforcement mechanism. The Plaintiff may not now bypass that mechanism by alleging a constitutional violation and bringing suit directly under § 1983"); *see also Ferguson v. Walker*, 397 F. Supp. 2d 964 (C.D. Ill. 2005) (adopting the reasoning in *Satterfield* to the effect "that Plaintiff's § 1983 claims are subsumed by USERRA").

These decisions are persuasive, and plaintiffs have identified no controlling, comparable authority to support a determination to the contrary. Therefore, to the extent that plaintiffs are continuing to assert § 1983 claims of discrimination due to their military service under theories of Equal Protection, Due Process, or the First Amendment, such claims are preempted by USERRA and will not proceed to trial.[9]

2. Section 1983 Claims Asserting First Amendment Violations Unrelated to Military Service.

Counts III and IV of the FAC merely allege that defendants violated Alves' and Simoes' "constitutional and civil rights under 42 USC § 1983," without asserting any specific constitutional rights. (#21 ¶¶ 162, 164.) In opposition to summary judgment, plaintiffs explain that:

> Defendants are being charged with violating the Plaintiffs' constitutional rights to Free Speech, Due Process, and Equal Protection and treatment. Aside from any USERRA claims that the Plaintiffs were being harassed and retaliated against because of their military service, it just as easily could be held that they were being harassed and retaliated against because they were filing grievances and participating in union activities, exposing problems in the GPD, voicing complaints and criticizing their superiors' actions; all legal activity that every person (including police officers) have a right to do under the Federal and Commonwealth's constitutions.

(#86 at 15-16).

Apart from its argument regarding preemption, which address all three of plaintiffs' constitutional theories, in a separate section of its brief challenging plaintiffs' First Amendment

---

[9] The court says "to the extent" because it is not clear that plaintiffs are continuing to assert § 1983 claims related to their military service. In opposition to summary judgment, they seem to draw a distinction between claims under USERRA based on their military service and claims under § 1983 based upon their exercise of constitutional rights. (#86 at 12-13.) The court notes only that, in opposition to dismissal, plaintiffs asserted a due process right not to be discriminated against or harassed because of their military service. *See* #28 at 5; *see also* #21 ¶ 82 (alleging in FAC that Alves was "the only officer to be deprived of his due process rights"). Similarly, they asserted an equal protection right not to be treated differently because of their military service. (#28 at 5.) They also asserted that they had a right that defendants "obey the law as spelled out in USERRA." *Id.* These previously asserted § 1983 claims, based on discrimination due to plaintiffs' military service, are preempted.

theory under § 1983, the City focuses solely on the incident when Simoes was disciplined for wearing a "Free Cliffy" t-shirt. (#80 at 13-14.) As described above, plaintiffs also recited theories related to Equal Protection and Due Process in opposition to summary judgment, which the City did not address in its reply. *See* #86 at 15 (discussing allegations about exposing problems in the GPD and being punished for filing grievances). *See generally* #89. The court will not dismiss or enter summary judgment for the City on these two theories when it has failed to develop arguments on them.[10] Where the City only challenges the "Free Cliffy" t-shirt incident under plaintiffs' First Amendment theory, summary judgment will only be allowed or denied as to that allegation.

In challenging the "Free Cliffy" incident, the City argues that, as a public employee, Simoes was not speaking on a matter of public concern when wearing the t-shirt and that, therefore, no First Amendment protection applies. (#80 at 13-14.) Rather than address this argument head-on, plaintiffs' opposition instead focuses on their overall right to bring a First Amendment claim under § 1983. (#86 at 15-17.)

Public employees do not lose their right to First Amendment protection by virtue of their employment. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968). However, "[t]o be protected, the speech must be on a matter of public concern, and the employee's interest in expressing herself on this matter must not be outweighed by any injury the speech could cause to 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Waters v. Churchill*, 511 U.S. 661, 668 (1994) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)); *id.* at 675 ("When someone who is paid a salary so that she will contribute to an

---

[10] Plaintiffs are nonetheless advised that the failure to adduce proof of the essential elements of these theories at trial will result in the entry of a directed verdict, if requested.

agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her.").

The First Circuit has outlined a three-part test for analyzing a public employee's First Amendment claim. "First, we must assess whether [plaintiff] 'spoke as a citizen on a matter of public concern.' In making this determination, we ask whether the 'speech' underlying [plaintiff's] claim was made 'pursuant to his official duties.'" *Gilbert v. City of Chicopee*, 915 F.3d 74, 82 (1st Cir. 2019) (citations omitted) (first quoting *Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007); then quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). If a plaintiff is found to have been speaking in a private capacity, next "the court must 'balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Decotiis v. Whittemore*, 635 F.3d 22, 29 (1st Cir. 2011) (alteration in original) (quoting *Curran*, 509 F.3d at 44). "Third, the employee must 'show that the protected expression was a substantial or motivating factor in the adverse employment decision.'" *Id.* (quoting *Curran*, 509 F.3d at 45). "If all three parts of the inquiry are resolved in favor of the plaintiff, the employer may still escape liability if it can show that 'it would have reached the same decision even absent the protected conduct.'" *Id.* (quoting *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 765-766 (1st Cir. 2010)).

> Some of the factors used to identify speech made in a professional capacity include:
>
> whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it "official significance"); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech.

*Gilbert*, 915 F.3d at 82 (quoting *Decotiis*, 635 F.3d at 32). "If [the court] conclude[s], . . . after applying these factors, that [plaintiff's] speech was made 'pursuant to his official duties,' then [plaintiff] has no First Amendment claim" and the inquiry ends there. *Id.* Public employees have been found to be speaking on matters of public concern when they have raised concerns about the administration of a public program, *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 117 (1st Cir. 1977), and "the way public monies are spent [and] the compliance of agencies with state law." *Pilkington v. Bevilacqua*, 439 F. Supp. 465, 474 (D.R.I. 1977).

Yet "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. For example, in *Gilbert*, the First Circuit held that "grievances against fellow officers or public officials . . . arose in essentially the . . . police department internal affairs context" and were therefore "quintessential employment-related speech made pursuant to official duties." 915 F.3d at 84. "This type of communication—complaints or concerns made up the chain of command—is the quintessential example of speech that owes its existence to a public employee's official responsibilities and thus is not protected under the First Amendment." *Id.* at 83; *see O'Connell v. Marrero-Recio*, 724 F.3d 117, 123 (1st Cir. 2013) (stating that public employee's statements to supervisors that she did not want to perform certain tasks she found to be unethical were employment-related speech and not protected). "Underlying [the Supreme Court's] cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Garcetti*, 547 U.S. at 420 (quoting *Connick*, 461 U.S. at 154); *see Tang v. Dep't of Elderly Affairs*, 163 F.3d 7, 11-12 (1st Cir. 1998) ("[A]bsolute First Amendment protection is not accorded to any grievance a public

employee files against an employer, without regard to content. If it did, anything she said in the Department 'would plant the seed of a constitutional case.'" (quoting *Connick*, 461 U.S. at 149)).

"When, as in this case, the material facts are undisputed" as to the content of the speech at issue, "it is a question of law for the Court to decide whether a [plaintiff] 'was both (1) speaking about a matter of public concern and (2) speaking as a citizen.'" *Firenze v. NLRB*, 993 F. Supp. 2d 40, 48 (D. Mass. 2014) (quoting *Foley v. Town of Randolph*, 598 F.3d 1, 5 and n.7 (1st Cir. 2010)), *report and recommendation adopted by* 993 F. Supp. 2d 40 (D. Mass. 2014). Simoes does not dispute that he wore a "Free Cliffy" t-shirt to a union meeting, which was held at the GPD, to express his opposition to Alves' suspension during an investigation into the accidental shooting. (#81 ¶¶ 69-74.) Simoes complains that he was disciplined in retaliation for wearing the t-shirt and that this was a violation of his First Amendment rights. (#21 ¶¶ 61, 137-138.) The t-shirt's message, asking the chief to "free" Alves from his suspension, is clear: in wearing the t-shirt at the GPD, Simoes was directly challenging the GPD's decision-making around the investigation into Alves' accidental shooting. "Any such speech is more accurately characterized as complaints about the workplace than as speech made by a citizen intending to contribute to public discourse." *Firenze*, 993 F. Supp. 2d at 50. On the facts presented, even viewing the evidence in the light most favorable to plaintiffs, a reasonable jury could not find that this incident involved anything other than "employment-related speech." *Gilbert*, 915 F.3d at 84. Summary judgment for the City is allowed as to Simoes' First Amendment theory under Count IV as to the "Free Cliffy" t-shirt incident.[11]

---

[11] Again, the City did not address plaintiffs' other allegations of retaliation for engaging in union activities and filing grievances, nor their allegations that Campanello suppressed the filing of grievances. The City also has not raised, at any point in this litigation, whether those claims might be preempted by the National Labor Relations Act. *See Hosp. Cristo Redentor, Inc. v. NLRB*, 488 F.3d 513, 517 (1st Cir. 2007) ("Employers violate section 8(a)(1) of the Act by, inter alia,

3. Municipal Liability.

Having allowed the City's motion as to this single allegation of Simoes' under Count IV,

the court need not address the City's arguments regarding municipal liability at this time. The City

may raise the issue again at trial.[12]

V. Conclusion.

For the reasons set forth above, the City's motion for summary judgment (#79) is denied

with respect to Counts I and II, and allowed in part and denied in part with respect to Counts III

and IV.

/s/ M. Page Kelley
M. Page Kelley
March 29, 2022                                    Chief United States Magistrate Judge

---

'coercively interrogating employees about their union activities or sentiments, or about the activities or sentiments of others, and by either directly or indirectly threatening employees.'" (quoting *NLRB v. Horizons Hotel Corp.*, 49 F.3d 795, 804 (1st Cir. 1995)); *Fleming v. Stop & Shop Supermarket Co.*, No. 96-cv-594, 1997 U.S. Dist. LEXIS 7495, at *18 (D. Conn. Mar. 10, 1997) (dismissing a claim for First Amendment violation as preempted by § 8(a)(1) and "within the primary and exclusive jurisdiction of the NLRB"); Fisk, Catherine L. *A Progressive Labor Vision of the First Amendment: Past as Prologue.* 118 Columbia L. Rev. 2057, 2070 (2018) ("Since the early 1940s . . . the First Amendment has not been salient to labor law. . . . [A]lthough the [Supreme] Court withdrew labor from the First Amendment field, it trusted the NLRB and Congress to protect that which was worthy of protection."); *see also Hoffman v. United States Postal Serv.*, No. 09-cv-10834-NG, 2009 U.S. Dist. LEXIS 143849, at *2 (D. Mass. June 9, 2009) ("To the Court's surprise, given [plaintiff's] central allegation that the Postal Service seeks to subject him to a fitness for duty exam only as retaliation for his union activities, neither party addressed the applicability of the National Labor Relations Act . . . in their papers . . . ."). The parties are advised that they will need to address the court's jurisdiction to hear claims related to such allegations prior to trial.

[12] Plaintiffs wrongly assert that, because the court is treating the allegations against the GPD as allegations against the City, the City's argument regarding municipal liability under *Monell* and progeny is "moot." *See* #86 at 18. The court's previous ruling that the GPD is not a suable entity had nothing to do with the sufficiency of the allegations or proof bearing on municipal liability.